SOUTH EAST LAKE VIEW NEIGH-BORS, Park West Community Association, Cheryl Raff, and Richard Means, Plaintiffs,

v.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Moon Landrieu, Elmer Binford, and Lawrence B. Simons, Defendants.

No. 80 C 4363.

United States District Court,
N.D. Illinois, E.D.

July 2, 1981.

Robin Charleston, Lawrence P. Bemis, Kirkland & Ellis, Valerie A. Leopold, Valerie Hughes Staulcup, Chicago, Ill., for plaintiffs.

Dan K. Webb, U.S. Atty., Mary E. Rigdon, Asst. U.S. Atty., Chicago, Ill., Timothy J. Hartzer, HUD, Litigation Div., Washington, D.C., for defendants.

Jack M. Siegel, Jack M. Siegel & Associates, Chicago, Ill., for intervening defendants.

## DECISION

McMILLEN, District Judge.

This case is now before the court on the motion of the defendants and the intervenors to dismiss. These motions were filed and partially briefed before Judge Hoffman denied plaintiffs' motion for a preliminary injunction, but they have never been ruled on. Although the Court of Appeals remanded this case "for trial as immediately

as possible [sic] on the permanent injunction," the threshold motions must be decided before any trial. We believe the motions are well-founded and that plaintiffs lack standing to sue.

■ On these motions we take the allegations of the complaint to be true and must deny the motions if plaintiffs could prove any facts which would show them to be entitled to relief. *Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Since no genuine issues of material fact have yet been raised, our decision is based solely on the law as applied to the second amended complaint.

A 17-story apartment building being erected on the corner of Broadway and Diversey on the near north side of Chicago is at the center of this matter. Seventy-six of the residential units will be subsidized for elderly and handicapped tenants; another 71 have been set aside for families with low and moderate income. The remaining 102 residential units will be available for rental at market rates. The building also has commercial space for rental on the ground floor.

The plaintiffs include the South East Lake View Neighbors (SELVN), a not-for-profit corporation, and the Park West Community Association (PWCA), a similar not-for-profit association, both consisting of residents of the area affected by the new building. Individual plaintiffs on the complaint as originally filed were Cheryl Raff and Richard Means, members of SELVN and PCWA, respectively. The second amended complaint, filed March 23, 1981 added as individual plaintiffs Clara Goldman and Evelyn Caldwell, residents of the community who are allegedly qualified for federal housing assistance ("Section 8 assistance") and potential tenants of the new building.

Defendants are various Federal entities including the Department of Housing and Urban Development; Moon Landrieu, its secretary sued in his official capacity; Elmer Binford, sued in his official capacity as Chicago HUD Manager; and Lawrence B. Simons, sued in his official capacity as Federal Housing Commissioner.

The following also intervened as defendants: the developers Sheldon Baskin, William DeWoskin and Daniel Epstein; and several individuals alleged to have "priority" for apartments in the new building because they were dispossessed by the demolition of the Rienzi Hotel which previously occupied the land in question.

Defendants (both the intervenors and the governmental defendants) continue to maintain that (1) the plaintiffs lack standing to bring this suit and (2) the complaint fails to state a claim upon which relief may be granted. The intervenors have also filed a counterclaim, based on plaintiffs' alleged interference with their civil rights.

The amended complaint contains four counts, all of which stem from the alleged failure of HUD to comply with its regulations and seek to terminate Federal assistance for the Broadway-Diversey project, as follows:

*Count I:* Under the Housing and Community Development Act, 42 U.S.C. § 1437f, and the regulations promulgated thereunder, the project was submitted to HUD for approval under the procedure outlined for "fast track" processing. This procedure may be followed when a public housing agency (in this case the Illinois Housing Development Authority) determines and certifies to HUD that the proposed project meets the requirements for Section 8 assistance. However, subsequent to the initial IDHA application to HUD for set-aside of Section 8 funds for the project but before acceptance by HUD, the IDHA financing fell through. As a consequence, plaintiffs argue that approval for the project should have been obtained pursuant to "slow-track" processing, which involves more detailed processing by HUD itself in lieu of the reliance on state certification utilized in "fast-track" processing.

Plaintiffs complain that HUD's failure to process the application under the more stringent requirements was arbitrary, capricious, an abuse of discretion and not in accordance with the law. Specifically, they

allege that the project does not meet the site and neighborhood standards applicable, that it should not have been approved for families with children and elderly because it is a high-rise elevator building, that it was approved prior to the preparation of an environmental impact statement, in violation of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 and HUD's regulations, and that it was processed in violation of other HUD regulations. Under this count plaintiffs pray for declaratory relief and an injunction restraining the Federal defendants from granting the project directly or indirectly any rent supplement or housing assistance funds under Section 8 and whatever other relief is considered just.

*Count II:* This count is an expansion of the claims in Count I that the approval of the project prior to the preparation of an environmental impact statement constitutes a violation of NEPA. The relief requested in Count II is identical to that of Count I.

*Count III:* The National Housing Act of 1934, 12 U.S.C. § 1715*l*, authorizes the agency to insure any mortgage for new construction eligible for housing assistance payments under Section 8. HUD has approved the application for $16,808,300 mortgage insurance for the project. Plaintiffs allege that, since the approval of the project for Section 8 assistance is improper, the mortgage insurance is also improper. Plaintiffs seek a declaration that the defendants' approval of the mortgage insurance violates the statute, an injunction against the grant of the insurance, and any other relief deemed equitable.

*Count IV:* The Government National Mortgage Association has agreed to purchase the FHA-insured mortgage, and plaintiffs allege that without the housing assistance payments which they seek to enjoin under the other portions of the complaint, the mortgage would not qualify for purchase under 12 U.S.C. §§ 1716 *et seq.* Plaintiffs again seek declaratory and injunctive relief.

Plaintiffs moved for a preliminary injunction, and a hearing was held by Judge Hoffman on October 14, 16, 17, and 20, 1980. The Seventh Circuit Court of Appeals affirmed Judge Hoffman's denial of preliminary relief by order dated March 5, 1981. The appellate court stated that, because of the lower court's exclusion of evidence at the hearing, the record was unclear whether plaintiffs are entitled to relief. The order concluded (p. 2):

> The best vehicle for final and quick decision on the merits is to proceed to trial on the permanent injunction. We therefore affirm the denial of the preliminary injunction although we express no opinion on the merits of plaintiff's claims. We remand for trial as immediately as possible on the permanent injunction so that the parties can fully and expeditiously litigate all the issues in this lawsuit *including the pending problem relating to standing.* [emphasis added]

The issue of standing must be examined as to each of the plaintiffs in order to determine whether their claims are sufficient to invoke this court's jurisdiction. As indicated above, this issue was expressly left open by the Seventh Circuit.

In denying standing to certain indigents and their organizations, the Supreme Court stated in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 37–38, 96 S.Ct. 1917, 1923–1924, 48 L.Ed.2d 450 (1976):

> No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.... The concept of standing is part of this limitation. [S]tanding "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated" [citations omitted].

### A. The Neighborhood Organizations, as Such

Both of the plaintiff organizations in this case allege that each of its *members:*

> will be and are directly injured by the adverse consequences of the Diversey-

Broadway project and the actions of the defendants, including but not limited to the increased population density, traffic and parking congestion, and increased environmental pollution caused by the building. [The organization's] injury has been and will be caused by the federal commitment to and support of the development and construction of the Diversey-Broadway high-rise project. (Second Amended Complaint, pars. 2 and 3.)

■ The organizations have not alleged injury to themselves as such except by the foregoing sentences. The organizations are not financial institutions or private citizens. Hence these allegations are of no legal significance insofar as standing is concerned.

■ In certain situations an association may invoke the jurisdiction of the federal courts for its members in a representative capacity (e.g. *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) which rebuffed the state's demand for the Association's membership lists). In *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the court said at p. 511, 95 S.Ct. at p. 2211:

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members.... The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy.... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit [citations omitted].

Thus these two plaintiff associations may establish standing (if at all) only as representatives of their individual members if a member could have sued on his own behalf. *Simon v. Kentucky Welfare Rights Organization, supra* p. 578 at 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1975). Therefore, the standing of the neighborhood organizations must also be examined in the light of the claims of the individual members.

### B.  Plaintiffs Raff and Means

These two members of the organizations allege that they will be adversely affected by the government support for the Diversey-Broadway project because of increased traffic congestion, air and noise pollution, population density, parking limitations and other "environmental impacts." In deciding whether such individuals have standing to bring this suit, the Supreme Court has held that it is appropriate and necessary to look to the substantive issues in order to decide whether there is a "logical nexus" between the plaintiffs' asserted status and the claim sought to be adjudicated. *Flast v. Cohen,* 392 U.S. 83, 101–102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

■ The nexus between the alleged injury and the relief requested seems to be lacking in this case. While plaintiffs allege that they will be burdened and damaged in various ways, they do not sue as taxpayers or seek relief which would eliminate the problems which they fear. The complaint as originally filed did not seek to stop the development *per se.* The reality of the situation is that it is all but complete. Since the building presumably conforms to zoning ordinances and is in place, the problems attacked by these plaintiffs will remain regardless of whether the proper procedures were followed to obtain Federal financing. To find that without federal backing the plaintiffs would not have been faced with additional population density is unrealistic and counter-productive. Nor do plaintiffs allege that their harm will stem from the presence of low- or moderate-income or elderly tenants in the building; rather, they complain as interested neighbors that Federal funding will increase the sheer number of people in their neighborhood, a concomitant of any new high rise dwelling.

Plaintiffs' objective is simply to stop federal housing assistance payments and the consequent mortgage assistance. In *Simon* (*supra* p. 578), a similar lack of causal

connection between the relief requested and the alleviation of the alleged injury was found. There, the indigent plaintiffs alleged that a certain revenue ruling encouraged hospitals to refuse to treat them. However, it was not clear that the tax incentive, as opposed to other considerations, was the cause of the plaintiffs' damages or that a favorable decision by the court would have caused the hospitals to increase their services to the plaintiffs. The Court's reasoning in finding that the plaintiffs lacked standing in that case is applicable here (426 U.S. at 44–46, 96 S.Ct. at 1927–1928):

> As stated in [*Warth v. Seldin, supra* p. 579], ... indirectness of injury, while not necessarily fatal to standing "may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of defendants' actions, or that prospective relief will remove the harm." 422 U.S., at 505 [95 S.Ct., at 2208]. Respondents have failed to carry this burden. Speculative inferences are necessary to connect their injury to the challenged actions of the petitioners [footnote omitted]. Moreover, the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire. A federal court, properly cognizant of the Art. III limitation upon its jurisdiction, must require more than respondents have shown before proceeding to the merits.

None of the harms alleged by the original plaintiffs stem from federally subsidized housing as such. Rather, they are general urban-type complaints: congested traffic, overcrowded public facilities, lack of parking space. Without minimizing these alleged injuries, the effect that this court's granting of complete relief would have on alleviating them is entirely speculative. Plaintiffs here "rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." *Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343.

### C. The Elderly Plaintiffs, Eligible For Housing

Subsequent to the Seventh Circuit's remand of this case, the complaint added two plaintiffs. Clara Goldman, now living in the Lawn View area, is allegedly on the waiting list for Section 8 housing and contends that her health and safety would be injured as a potential resident of the Diversey-Broadway project because of the congestion, pollution, traffic and the dangers of elevators. Similar complaints are claimed on behalf of Evelyn Caldwell, currently living in Section 8 housing. Both allege that the injury to their health, safety and well-being has been and will "be caused by the federal commitment to and support of the development and construction of" the project. Absent is any allegation that either woman expects to be forced to move into the building; neither plaintiff alleges that there is a scarcity of housing available for Section 8 assistance. They apparently seek to prevent additional Section 8 housing because it would interfere with their present or future enjoyment of it.

The addition of these two plaintiffs has therefore not advanced the viability of this case. In *Warth v. Seldin, supra* p. 579, some plaintiffs were low and moderate income residents of a city who challenged a suburb's zoning ordinance on the grounds that it excluded lower income people. The court found that these individuals lacked standing because they failed to demonstrate that:

> they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, "none may seek relief on behalf of himself or any other member of the class" [citations omitted].

*Warth,* 422 U.S. at 502, 95 S.Ct. at 2207. We hold only that a plaintiff who seeks to challenge exclusionary zoning practices

must allege specific, concrete facts demonstrating that the challenged practices harm *him,* and that he personally would benefit in a tangible way from the court's intervention [footnote omitted]. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of "a real need to exercise the power of judicial review" or that relief can be framed "no [broader] than required by the precise facts to which the court's ruling would be applied" [citations omitted].

*Warth,* 422 U.S. at 508, 95 S.Ct. at 2210.

*Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1978) was a case originating in the Northern District of Illinois in which the Supreme Court reviewed recent cases dealing with standing, and in the course of its discussion stated at 441 U.S. pp. at 99–100, 99 S.Ct. at pp. 1607–1608:

> In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. Otherwise, the exercise of federal jurisdiction "would be gratuitous and thus inconsistent with the Art. III limitation."

> Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim. For example, a litigant normally must assert an injury that is peculiar to himself or to a distinct group of which he is a part, rather than one "shared in substantially equal measure by all or a large class of citizens." He also must assert his own legal interests, rather than those of third parties.

> Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one "who otherwise would be barred by prudential standing rules." In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered "a distinct and palpable injury to himself," that is likely to be redressed if the requested relief is granted [citations omitted].

None of these plaintiffs has alleged any facts which would support the presumption that he would benefit in a tangible way from the court's intervention. It would be speculative (not to mention irrational) to find that the withdrawal of federal assistance would in any way lessen the alleged impact of the new apartment building on the neighborhood. It is too late to speculate as to what might have happened if no federal assistance had been approved in the first place. Likewise we cannot speculate what the city's building department would have done had the permit been contested at the outset. The only issue is whether these plaintiffs have standing under the circumstances as they now exist. As the foregoing discussion points out, the relief requested will not treat the injury alleged. Consequently, the amended complaint is dismissed.